UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MIRIAM COHEN,<br><br>                              Plaintiff,<br><br>v.<br><br>AMERICAN CREDIT BUREAU, INC.,<br><br>                              Defendant. | Civil Action No. 10-5112 (WJM)<br><br><br><br>REPORT AND RECOMMENDATION |

FALK, U.S.M.J.

Before the Court is the application of Plaintiff Miriam Cohen's attorney, Michael M. Cohen, Esq., for counsel fees pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"). For the reasons stated below, it is respectfully recommended that Plaintiff be awarded $1,046.75 in attorney's fees and $453.00 in costs for a total award of $1,499.75.

## Summary

This case is about a single message left on an answering machine attempting to collect a $150.00 debt. The sole violation of the FDCPA is purely technical—that the amount of the debt was not mentioned in the telephone message. However, there were three letters that previously identified the $150 amount of the debt. The merits

of the case were resolved by Plaintiff's acceptance of an Offer of Judgment for $1,001.00, one dollar more than the maximum statutory damages recoverable under the FDCPA.  The issue is now attorney's fees.  Plaintiff's counsel, Michael M. Cohen, is married to Plaintiff Miriam Cohen.  Mr. Cohen claims that he is entitled to collect $29,210.25 in attorney's fees.  Defendant contends the fee award should be $348.75.

## Background of Fair Debt Fee Disputes

In Weed-Schertzer v. Nudelman, Klemm & Golub, 2011 WL 4436553 (D.N.J. Sept. 23, 2011), adopted at, 2011 WL 4916309 (D.N.J. Oct. 13, 2011), this Court expressed certain concerns over the state of Fair Debt attorney's fee disputes and indicated that it would further explore the issue in appropriate circumstances. Specifically, Weed-Schertzer states:

> Although the fees in dispute are relatively small, the integrity of the billing process in small Fair Debt cases is called into question.  Often, the law firms involved on both sides are the same.  This Court has observed that liability is commonly resolved immediately and the real dispute presented to the federal court is about legal fees.  Deciding the fee issue can be time consuming, even though the sums in dispute are often similar to numbers handled by small claims courts.   Drawing no conclusions here, the Undersigned believes it bears further observation. Specifically, whether the practice on the ground is

2

<u>consistent with the intent of the Fair Debt Act</u>.

<u>Id.</u> at *8 (emphasis added).

The Court believes this scrutiny is justified by the increasing number of Fair Debt cases filed in this Court.[1] After <u>Weed-Schertzer</u>, fee requests in Fair Debt cases have also been commented on in a number of recent opinions in this district. <u>See, e.g.</u>, <u>Conklin v. Pressler & Pressler</u>, 2012 WL 569384 (D.N.J. Feb. 21, 2012); <u>Freid v. Nat'l Action Fin. Servs.</u>, 2011 WL 6934845 (D.N.J. Dec. 29, 2011); <u>Cassagne v. Law Offices of Weltman, Weinberg & Reis</u>, 2011 WL 5878379 (D.N.J. Nov. 23, 2011); <u>Levy v. Global Credit & Coll. Grp.</u>, 2011 WL 5117855 (D.N.J. Oct. 27, 2011).

Although Fair Debt cases may be factually different, they are also similar. Usually, the real dispute for the federal court to decide is one of attorney's fees. Liability is nearly always resolved by settlement or offer of judgment. Most FDCPA cases never reach the merits. This is a function of the FDCPA $1,000 maximum statutory penalty per case and the fact that few cases involve actual damages. Thus, it is not economically sensible for the parties to battle about the merits. Defendants commonly resort to serving an offer of judgment (or settlement offer) for the

---

[1] The Court inquired into the number of Fair Debt cases filed in each of the past four years. Jack O'Brien, Esq., Chief Deputy of Court Operations, indicated that there has been a consistent increase in the number of FDCPA filings from 2008 through 2011. More specifically, in this district there were 182 FDCPA cases filed in 2008; 238 cases filed in 2009; 364 cases filed in 2010; and 683 cases filed in 2011.

3

maximum statutory damages available, $1,000.00.  Plaintiffs have no practical choice but to accept the offer of judgment, since pressing the case would be meaningless.[2]

While the $1,000 penalty usually resolves liability, there is a rub.  The FDCPA also provides that a successful plaintiff may recover "reasonable" attorney's fees (*see, infra*, p. 14).  This is regarded as part of the penalty enforced by a winning plaintiff acting as private attorney general.  However, the attorneys do not often resolve the attorney's fees.  Thus, most FDCPA cases really boil down to attorney's fee disputes.

The FDCPA was not passed in order to sprout a cottage industry for lawyers who self-interestedly battle over attorney's fees in federal court.  See, e.g., Lee v. Thomas & Thomas, 109 F.3d 302, 306-07 (6th Cir. 1997) ("Counsel should not wish to reap financial rewards for prolonging litigation unnecessarily.").  And, in this Court's view, judicial economy is an appropriate consideration in addressing these repetitive, relatively minor fee disputes, especially as FDCPA filings rise and

---

[2] Perhaps this Fair Debt dance is effective and has helped to keep transgressing debt collectors honest.  The FDCPA is an important statute that courts are bound to enforce.  This is especially so in troubled economic times, which could spawn increased abusive debt collection efforts.  Indeed, nothing in this opinion should be read to minimize violations of the statute nor to condone abusive debt collection efforts, which the Court regards as repugnant.  Similarly, the Court certainly does not intend to demonize legitimate debt collectors who may have occasionally committed a technical violation of the FDCPA.

resources shrink.  It is against this backdrop that the current fee dispute is decided.[3]

\*          \*          \*

## Fee Dispute In This Case

In this unique case, Plaintiff's counsel, Michael M. Cohen, Esq., filed a complaint on behalf of his wife, Plaintiff Miriam Cohen.  Mr. Cohen vaguely pleaded that Defendant, American Credit Bureau ("Defendant" or "ACB"), committed "at least fifteen [15] FDCPA violations" many of which occurred during the same telephone call.  (Compl., ¶¶ 9, 16-17.)  The 15 supposed violations are mentioned in the background section of the Complaint; however, Mr. Cohen then attempts to limit the pleading by seeking "statutory damages for just <u>one</u>" of the at least 15

---

[3] Courts have struggled with the proper balance between compensating counsel and large fee requests under federal fee shifting statutes.  Indeed, more than twenty-five years ago, four Third Circuit Judges opined: "Both the judiciary and the public increasingly are becoming concerned that a portion of the legal profession seems to be more interested in the subject of fees than in performing quality legal services.  This perception, if left unchecked by careful judicial scrutiny, may threaten the viability of the counsel fee statute for legitimate social ends.  The question of disproportionate attorney's fees is a matter sufficiently serious, I believe, to command the attention of the entire court."  <u>Cunningham v. City of McKeesport</u>, 753 F.2d 262, 270 (3d Cir. 1985) (Statement by Circuit Judge Adams, Sur Denial of Petition for Rehearing; Joined by Circuit Judges Hunter III, Weis, and Garth), <u>vacated and remanded by</u> 478 U.S. 1015 (1986).  This issue is magnified in FDCPA cases, where the maximum statutory penalty is $1,000.00.

violations—purporting to save the rest for later.  (Compl., ¶ 10) (emphasis added).[4]

Mr. Cohen's intention—expressed to the Court, his adversary, and in the papers submitted on this motion—was to use his wife's case to "make law."  (Def.'s Ex. 3; CM/ECF No. 24-4.)  Apparently the "law" he sought to make was to establish the right to bring 14 separate subsequent lawsuits—each one targeting a single one of the 14 alleged violations—even though many of the supposed violations were quite technical and apparently occurred during the *same telephone message* and all involved *the same $150 debt*.

The Court views Plaintiff's threat of successive lawsuits for technical violations of the FDCPA as improper.  It is doubtful any Court would sanction such a blatant multiplication of litigation.  According to Plaintiff's position, if a debt collector sent one letter that contained ten technical violations of the FDCPA, the

_____

[4] Mr. Cohen confirmed this during argument by repeatedly stating he sued for one specific violation of the FDCPA.  (Transcript of Case Management Conference  (2/1/12) (hereinafter cited as "Tr. (2/1/12)") at 12:20-23 ("THE COURT: [P]laintiff, you pleaded one violation in your complaint; correct?  MR. COHEN: Correct.  I pled – I pled one violation in the complaint."); 14:11-13 ("THE COURT: So the one – the one violation, what this case is all about – MR. COHEN: Right."); 16:17-25 ("THE COURT: That's the one violation. There may have been other violations in the same phone call.  Is that what you're saying? MR. COHEN: Yes, but that's not – I'm not – that has nothing to do with the merits of the case.  The case is about one violation.  THE COURT: One violation and one violation only; right?  MR. COHEN: Correct."); 19:2-6 ("THE COURT: You've made it crystal that the amount of the debt is what there's this one violation and that is on the call that was placed to the plaintiff, they did not state the amount [of] the debt.  That what this whole case is about.  MR. COHEN: Correct, Your Honor.")).

victim could theoretically bring 10 separate federal cases to remedy the violation, each one permitting $1,000 in statutory penalties and mandatory attorney's fees. It is no wonder that there is no authority for this inefficient, extravagant position. Yet, Plaintiff's counsel persisted with this threat of successive lawsuits for at least six months, repeatedly rejecting settlement offers for the maximum statutory damages available—all while Mr. Cohen continued to accrue attorney's fees by this hollow, Damocles' sword threat.[5]

Eventually, Plaintiff accepted an Offer of Judgment for $1,001.00 plus a "reasonable" attorney's fee. The equivalent of this Offer of Judgment was offered prior to the filing of the Complaint, but Plaintiff waited until her husband accrued nearly $25,000.00 in attorney's fees to accept it. Specifically, Defendant offered

---

[5] It could be argued that Defendant shares responsibility for prolonging this case. Although it made repeated settlement offers comprising the statutory maximum per case damage amount, it did not serve a formal offer of judgment until March 25, 2011. Had Defendant filed its Offer of Judgment at the outset of the case, it could have forced the issue and might have limited the legal fees requested. Defendant has not fully explained its delay in filing the Offer of Judgment. Settlement offers are not offers of judgment pursuant to Federal Rule of Civil Procedure 68. Thus, Defendant exposed itself to increased fees and costs by not offering judgment. Notwithstanding Defendant's delay in serving a formal offer, under the unique circumstances present here, the Court is satisfied the fee award should be limited as set forth herein.

On the other hand, Plaintiff could have cut off all further debt collection efforts by Defendant much earlier. According to Plaintiff, Defendant's initial contact was a phone message on May 12, 2010. Mr. Cohen was retained on June 10, 2010, and charges half an hour of time on that date. Pursuant to the FDCPA, once a debtor sends a cease and desist letter to a debt collector, all collection efforts must cease. 15 U.S.C. § 1692c(c). Mr. Cohen did not send the equivalent of such a letter until August 5, 2010. (Pl.'s Supplemental Letter dated February 2, 2012, at Ex. A.)

$1,500.00 to settle Plaintiff's claims pre-suit.  (Def.'s Ex. 2; CM/ECF No. 24-3.)  It was rejected based on Mr. Cohen's bluff of successive litigation.

The threatened separate lawsuits were never filed and the one-year statute of limitations under the FDCPA has expired.  All that is left to show for those unasserted "claims" is nearly $29,000.00 in attorney's fees that Plaintiff wants to tax against Defendant.

For the reasons set forth below, this Court believes that Plaintiff's request for $29,210.25 in attorney's fees is unreasonable and contrary to the intent of the Fair Debt Act.

## Factual Background

### A.  The Complaint[6]

The Complaint was filed on October 5, 2010.  Plaintiff Miriam Cohen is represented by her husband, Mr. Cohen.  She alleges that she received a phone message on May 12, 2010, from Defendant attempting to collect a debt, and that during this initial communication, Defendant failed to disclose certain information required by the Act, including the amount of the alleged debt. (Compl., ¶¶ 16-17, 26.) Plaintiff also claims that Defendant subsequently left "numerous messages" on her

---

[6] The description of the events precipitating the filing of this action are taken directly from Plaintiff's Complaint.  However, as is discussed in Section 2, *infra*, there are numerous inconsistences between statements in the Complaint, statements made in the briefing, and statements on the record.

answering machine that did not comply in various ways with the Act's technical disclosure requirements.  (Compl., ¶ 18.)  Finally, Plaintiff states that, in June 2010, Defendant placed a call to her home and impermissibly spoke with a "third-party," -- her husband and counsel, Mr. Cohen -- about the debt.  (Compl., ¶ 20.)

Plaintiff contends that each phone call and/or technical omission constitutes a separate and independent violation of the Act that can be filed as a stand alone federal lawsuit.  She claims that there are "at least 15" FDCPA violations, but that this case has been brought to address just <u>one</u>.  (Compl., ¶¶ 9-10.)  Despite filing this lawsuit to recover for just one violation, Plaintiff identifies and includes in the pleading the "non-asserted claims," presumably making them an issue in the case.  (Compl., ¶¶ 16-21.)

## B.   <u>Procedural History & Settlement Discussions</u>[7]

A plaintiff may not recover more than $1,000.00 in statutory damages in a Fair Debt action.  <u>See,e.g.</u>, 15 U.S.C. § 1692k(a)(2)(A); <u>Goodman v. People's Bank</u>, 209 Fed. Appx. 111,114 (3d Cir. 2006).  On August 25, 2010, prior to the filing of the Complaint, Defendant offered Plaintiff $1,500.00, to settle all of her FDCPA claims against Defendant.  (Pl.'s Ex. F (8/25/10).)  Plaintiff rejected the offer, despite it

---

[7] The parties have extensively referred to their settlement negotiations in the papers submitted.  It is for this reason only the Court repeats the content of their negotiations in this Report.

exceeding the statutory maximum available.  She claimed that Defendant was liable for 10 separate FDCPA violations and, therefore, she was entitled to $1,000.00 in statutory damages for *each* violation, in other words $10,000.00 in statutory damages, as well as attorney's fees.[8]  (Def.'s Ex. 1; CM/ECF No. 24-2.)  This position was taken despite Plaintiff's confounding refusal to include all ten claims in her request for relief.  (Compl., ¶¶ 9-10.)  At the time the $1,500 settlement offer was received, Plaintiff's counsel had billed a total of 2.65 hours to the file, which equates to $1,046.75 in attorney's fees.  (Declaration of Michael M. Cohen, Esq. ("Cohen Decl.") Ex. F at 1.)[9]

In January 2011, prior to the scheduling conference and the service of any discovery, Defendant offered Plaintiff $4,500.00, inclusive of fees and costs, to settle her FDCPA claims.  (Def.'s Ex. 2.)  Plaintiff again refused the offer.  (Def.'s Ex. 2.)  Instead, Plaintiff said she would accept $4,500 for just the single claim specifically

---

[8] Emails submitted as attachments to the briefs show that Defendant explained to Plaintiff's counsel, pre-suit, that the concept of separate lawsuits for each supposed violation of the Act had no basis in law and was in fact contrary to the existing, relevant authority; the entire controversy doctrine; and the express language of the FDCPA itself.  (Def.'s Ex. 2; CM/ECF No. 24-3.) Nevertheless, Plaintiff maintained the position, and Plaintiff's counsel responded by saying the "reason *I* filed this case . . . is to make law in this District."  (Def.'s Ex. 3 at 1; CM/ECF No. 24-4) (emphasis added).  As is discussed later, no authority for this position was provided, and Mr. Cohen has apparently abandoned his attempt to "make law," as no further lawsuits have been filed.

[9] This refers to time entries from June 10, 2010 through and including August 25, 2010.  Multiplying 2.65 hours by Mr. Cohen's hourly rate of $395.00 results in a total of $1,046.75.

alleged in the Complaint, but would not settle "all her claims" for the value of "just one claim." (Def.'s Ex. 3 at 2.)

On February 2, 2011, the Undersigned held an initial scheduling conference with counsel by telephone. Despite no scheduling order or any discovery served, Plaintiff's demand to settle her FDCPA claims was $17,500.00 ($9,500.00 in attorney's fees; $8,000.00 in statutory damages). (Affidavit of Richard J. Perr ("Perr Aff.") ¶ 1.) On February 14, 2011, again before any discovery had been served in the case and before the case had really commenced, Defendant offered Plaintiff $5,500.00 to settle her FDCPA claims. (Def.'s Ex. 5; CM/ECF No. 24-6.) Plaintiff again rejected the offer, claiming somehow that $11,000.00 in attorney's fees had already been billed to the case. (Def.'s Ex. 6; CM/ECF No. 24-7.)

Shortly after the initial conference, the parties served discovery. On March 22, 2011, Plaintiff responded to Defendant's requests. However, she did not produce any documents and provided unsigned and unverified answers to interrogatories. (Def.'s Exhs. 9, 10; CM/ECF Nos. 24-10, 24-11.) Despite this, Mr. Cohen's timesheets reflect that he billed 9.45 hours and nearly $3,800.00, reviewing the discovery requests; meeting with his spouse about them in various "office conferences";[10] and

[10] Plaintiff and her husband/counsel live at the same address in New Jersey. That address also doubles as Plaintiff's counsel's law office. In other words, it could be said that "office conferences" on Plaintiff's billing sheets amount to a husband and wife meeting and speaking in their own home.

preparing responses.  (Cohen Decl., Ex. F.)[11]

C.   <u>**Plaintiff's Acceptance of Defendant's Offer of Judgment**</u>

On March 25, 2011, Defendant served an Offer of Judgment, which states:

1.   Judgment shall be entered in the amount of $1,001.00, as against Defendant American Credit Bureau, Inc.

2.   In addition, Plaintiff's reasonable costs and reasonable attorney fees in connection with the claims against Defendant in the above-referenced action are to be added to the judgment; said fees and costs are to be in an amount as agreed to between counsel for the parties, or if they are unable to agree, as determined by the Court upon motion;

3.   The judgment entered in accordance with this Offer of Judgement is to be in total settlement of any and all claims by Plaintiff in the above captioned case against Defendant and its current and former employees, owners, and agents, and said judgment shall have no effect whatsoever except in settlement of those claims;

4.   This Offer of Judgment is made solely for the purposes specified in Rule 68, and is not to be construed either as an admission that Defendant is liable in this action, or that Plaintiff has suffered any damage.  All liability is denied.

(Def.'s Ex. 12; CM/ECF No. 24-13.)

On April 4, 2011, Plaintiff accepted the Offer of Judgment.  (Def.'s Ex. 13;

CM/ECF No. 24-14.)   The Offer of Judgment was basically offered before the

Complaint was even filed.  The "additional" claims that Plaintiff claimed she was

_____

[11] This includes time entries dated 2/24/11; 3/1/11; 3/10/11; 3/15/11; 3/19/11; and 3/21/11.

entitled to bring—which are the claims pleaded in the Complaint but somehow withheld for later lawsuits—have never been filed.  Since the other claimed violations all accrued prior to the date of the filing of Plaintiff's Complaint in October 2010, the one year statute of limitations applicable to Fair Debt cases has expired.  15 U.S.C. § 1692k(d); Peterson v. Portfolio Recovery Assoc., 430 Fed. Appx. 112, 114 (3d Cir. 2011).  In other words, Plaintiff actually *did* settle "all of her FDCPA claims" for the value of one case—i.e., $1,000.00.  Thus, Plaintiff essentially accepted Plaintiff's pre-suit initial settlement offer—but waited until $25,000.00 in attorney's fees accrued.

At the time the Offer of Judgment was accepted, despite little having occurred in the case, Mr. Cohen claimed that his attorney's fees were 59.5 hours and $25,740.50.   (Def.'s Ex. 13; CM/ECF No. 24-14.)   On May 18, 2011, the Undersigned held an in-person settlement conference in an attempt to resolve the attorney's fee issue but was unsuccessful.

On September 27, 2011, Plaintiff's counsel was directed to file the accepted Offer of Judgment on the docket and proceed with his fee petition.  Plaintiff took no action for a month.  As a result, the Undersigned issued an Order on October 27, 2011, directing Plaintiff's counsel to file the accepted Offer of Judgment by November 1, 2011, and his fee petition by November 7, 2011, and stating that failure to comply would result in termination of the case. (CM/ECF No. 17.)  With a court-

authorized extension, Plaintiff filed the Offer of Judgment on November 7, 2011. (CM/ECF No. 21.)

On November 14, 2011, Plaintiff filed the present motion for fees and costs, seeking $24,667.50 attorney's fees (which has been increased[12]) for 62.45 hours billed at $390.00[13] per hour.  (Pl.'s Br. 15.)  Plaintiff also requests $453.00 in costs. The motion was strongly opposed.

## Attorney's Fees Pursuant to the FDCPA

The FDCPA provides that "in a case of any successful action," a prevailing party may recover, "the costs of the action, together with a reasonable attorney's fee as determined by the court."  15 U.S.C. § 1692k(a)(3).   An award of reasonable attorney's fees and costs to a prevailing plaintiff in a FDCPA case is usually required. See Graziano v. Harrison, 950 F.2d 107, 113-14 (3d Cir. 1991).  However, an award of fees is not required in "unusual circumstances," such as "bad faith" conduct on the

---

[12] The Court held focused argument by telephone on February 1, 2012.  The parties were directed to submit supplemental letters addressing glaring omissions from the briefs submitted.  Mr. Cohen increased his fee request to $29,210.25 to account for activity occurring after the fee petition was filed, including, apparently, responding to the various inconsistences and inaccuracies raised by his pleadings (*see, infra*, pp. 20-24).

[13] Mr. Cohen's math does not add up.  A total of 62.45 hours billed at $390.00 per hour equals $24,355.50, not the $24,667.50 he initially requested.  It appears that Mr. Cohen reached the $24,667.50 by using an hourly rate of $395.00, which is the rate used on his billing sheets—but not in his fee petition.  The Court will use the rate of $395.00, giving Mr. Cohen the benefit of the doubt.

part of a prevailing plaintiff.  Id. at 114 & n.13 ("The presence of bad faith conduct on the part of a plaintiff would surely be an unusual circumstance justifying a denial of attorney's fees." (citing DeJesus v. Banco Popular de Puerto Rico, 918 F.2d 232, 234 n.4 (1st Cir. 1990))).

If an attorney's fee award is appropriate, the barometer for the quantum of the award is "reasonableness."  A "reasonable" fee award is one that is "adequate to attract competent counsel, but which does not produce a windfall to attorneys." Public Interest Research Group of NJ, Inc. v. Windall, 51 F.3d 1179, 1185 (3d Cir. 1995).  A reasonable fee is generally calculated by application of the lodestar method, which requires multiplying the hours reasonably expended by a reasonable hourly rate.  See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433-37 (1983); Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001).  While the lodestar is generally presumed to yield a reasonable fee, Washington v. Pa. County Court of Common Pleas, 89 F.3d 1031, 1035 (3d Cir. 1996), the lodestar may be adjusted based upon numerous factors, including, for example, the time spent and labor required; the novelty and difficulty of the legal issues; the customary fee in the community; whether the fee is fixed or contingent; the nature and length of the professional relationship with the client; and awards in similar cases. See, e.g., Windall, 51 F.3d at 1185 n.8 (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir.

15

1974)).  Perhaps the most important factor in determining the fee request is the degree

of success obtained.  <u>See</u> <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992).  Yet, in settling

on an appropriate fee, "[t]here is no precise rule or formula for making . . .

determinations.  The district court may attempt to identify specific hours that should

be eliminated, or it may simply reduce the award to account for . . . limited success."

<u>Thompson v. Wolpoff & Abramson</u>, 312 Fed. Appx. 161, 164 (11th Cir. 2008) (citing

<u>Hensley</u>, 461 U.S. at 436-37).

The Fair Debt Act does not mandate a fee award in the lodestar amount.  <u>See,</u>

<u>e.g.</u>, <u>Giovanni v. Bidna & Keys</u>, 255 Fed. Appx. 124, 125 (9th Cir. 2007); <u>Carroll v.</u>

<u>Wolpoff &Abramson</u>, 53 F.3d 626, 628-29 (4th Cir. 1995).[14]  For as one court has

noted:

> If the concept of discretion is to have any meaning at all, it
> must encompass the ability to depart from the lodestar in
> appropriate circumstances.  *Hensley* itself recognized that,
> in certain circumstances, an award in the lodestar amount
> may be excessive.

<u>Carroll</u>, 53 F.3d at 628-29.  In other words, rote application of the lodestar method

must be tempered by the overriding principle of "reasonableness," which by necessity

must account for "the facts and circumstances of the underlying litigation."  <u>Id.</u>  This

---

[14] <u>See also</u> <u>Jerman v. Carlisle, McNellie, Rini Kramer & Ulrich</u>, 130 S. Ct. 1605, 1621
n. 16 (2011) (noting that "Many" not *all* "District Courts apply a lodestar method . . .").

is consistent with the reality that the district court "has a ringside view of the relevant conduct of the parties and of the underlying legal dispute." Id. (quoting Alexander v. Mayor & Council of Cheverly Mass., 953 F.2d 160, 162 (4th Cir. 1992)).  Thus, inevitably, the district court "will engage in a fair amount of 'judgment calling' based upon its experience with the case and the general experience as to how much a case requires." Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 362 (3d Cir. 2001).  In other words, the district court managing the case is in the best position "to evaluate the quality and value of the attorney's efforts" when calculating a reasonable fee, Ballard v. Schweiker, 724 F.2d 1094, 1098 (4th Cir. 1984), and therefore, "retains a great deal of discretion in deciding what a reasonable fee award is." Bell v. United Princeton Prop., 884 F.2d 713, 721 (3d Cir. 1989).  Such broad discretion is necessary in order to dissuade counsel from the "propensity . . .to engage in secondary or satellite litigation" over attorney's fees.  Hensley, 461 U.S. at 433-37.

## Discussion

Plaintiff has requested $29,210.25 in attorney's fees for this lightly litigated case.  Defendant counters that Mr. Cohen has prolonged the litigation intentionally and that he is entitled to $348.75.

This case presents an unusual circumstance that does not warrant the award of the large attorney fee requested.  The reasons for a reduced award are: **(1)** Plaintiff

unreasonably prolonged this litigation by brandishing an unsupported legal theory that she could bring as many as 15 federal lawsuits, one after another, all arising out of the same transaction and $150 debt; **(2)** Plaintiff's threat of successive lawsuits borders on bad faith, since it was without authority and abandoned; **(3)** the claim that was actually brought in this case was extremely basic and resolved by an offer of judgment that was essentially proposed prior to the filing of the Complaint; **(4)** Plaintiff's Complaint and fee petition in this case contain numerous inconsistencies that leave the Court unsure of what really occurred in the case; **(5)** Plaintiff was unsuccessful, and thus not a prevailing plaintiff, on her claim for actual damages pleaded in the Complaint; **(6)** Mr. Cohen was unsuccessful in his express intention of filing this case to "change the law in this district" (see Def.'s Ex. 3) ; and **(7)** it is doubtful that Plaintiff and her husband/counsel were engaged in a legitimate, paying, arms-length attorney-client relationship.

The Court will award Plaintiff $1,046.75 in attorney's fees.  This amount is equal to the full amount of attorney's fees billed by Mr. Cohen prior to the filing of the Complaint.[15]  The Court believes this fee is appropriate as a matter of general reasonableness and separately as a consequence of the application of the lodestar

---

[15] As is explained *infra*, the award is based on the full amount of Plaintiff's counsel's billed hours (2.65) at that time of the pre-suit settlement offer multiplied by Mr. Cohen's suggested rate ($395.00).

method.

## 1.    Plaintiff's Complaint Presented A Basic Claim

Plaintiff's case is the most basic of Fair Debt cases.  In short, Plaintiff alleges that she received a telephone message during which Defendant did not identify the amount of the alleged debt.  (Compl., ¶ 26.)  But she clearly knew the debt was $150.00 from prior collection letters.  That is the whole case.  When evaluating fee requests, the difficulty or novelty of the claims is a factor to consider.  See, e.g., Windall, 51 F.3d at 1185 n.8.  Here, there were no novel issues of law.  Nothing complex was present in the Complaint.  The value of Mr. Cohen's services were limited.  Yet, counsel claims to have spent almost 60 hours litigating this case for six months.

## 2.    The Pleadings and Moving Papers Raise Many Inconsistences

In support of his fee request, Mr. Cohen implied that he is an expert in Fair Debt litigation and claims that he "single-handedly" "created" the "most important precedential ruling in the last twenty five years of FDCPA litigation," which "many commentators have written . .. has changed the face of debt collection in the United States forever."  (Declaration of Michael M. Cohen, Esq., ¶¶ 6-8.)[16]

---

[16] The "precedent" Mr. Cohen references is Foti v. NCO Fin. Sys., Inc., 424 F. Supp. 2d 643 (S.D.N.Y. 2006).

Despite this experience, the pleadings and briefs are rife with unexplained inconsistences. Simply put, the Court is not sure what Plaintiff was actually alleging and questions whether Mr. Cohen himself knew.

The Court understands that everyone makes mistakes. However, the inconsistency of counsel in litigating a case and pursuing a fee petition is a pertinent consideration in setting a reasonable attorney's fee. See, e.g., McKenna v. City of Philadelphia, 2008 WL 4435939 (E.D. Pa. Sept. 30, 2008). Thus, in an effort to obtain clarification of certain confusing allegations, the Court held a conference on February 1, 2012, and then directed the parties to submit supplemental letters. A sample of the problems are set forth below.

- The Complaint in this case contends that "initial communication" that gives rise to Plaintiff's sole claim was a telephone message received on May 12, 2010. (Compl., ¶¶ 16-17, 26.) However, it seems, there was no telephone message from Defendant left on May 12, 2010. In fact, there were *no* phone calls from Defendant to Plaintiff until mid-June 2010, which both parties now concede. (See Plaintiff's Supplemental Letter dated 2/2/12 ("Pl.'s Supp. Ltr.") [CM/ECF No. 30] at 1(referring to "June 30, 2010" phone call) & Ex. B; see also Defendant's Supplemental Letter dated 2/3/12 ("Def.'s Supp. Ltr.") at 1.)

- When Plaintiff's counsel was asked the amount of the debt, which was not pleaded and comprised the sole allegation in the case, Plaintiff's counsel stated that "I believe it was approximately a thousand dollars." (Tr. (2/1/12) at 2:20-21.) Mr. Cohen now concedes that the debt was $150.00. (Pl.'s Supp. Ltr. 1; Def.'s Supp. Ltr. 1, ¶ 2.) Moreover, the amount of the $150.00 debt was clearly stated on three collection letters sent to Plaintiff prior to the filing of the Complaint. (See Def.'s Supp. Ltr., at pp. 3-5.)

- Mr. Cohen represented to the Court that he never pleaded a claim for actual damages in this case. This is not so. See the following colloquy:

| | |
|---|---|
| MR. COHEN: | Your Honor, first of all, I never pled anything about actual damages in this case. I didn't settle the actual damages – |
| THE COURT: | Well — |
| MR. COHEN: | for nothing. I – may have preserved it for a distinct action, which I believe under the case law that I cited – and again – |
| THE COURT: | [. . .] But, frankly, in your complaint, you – you do – you asked very . . . in paragraph 28, you refer to actual damages, and that you say as a result of the following, ACB and its employees and agents [are] liable to plaintiff for actual damages in an amount to be determined at trial. So you did plead actual damages, I guess. You did plead actual damages. I mean it's – to say that you didn't plead actual damages is just not – I mean you pleaded it under Rule 11 . .. in a pleading to the Court. . . . |
| MR. COHEN: | Correct, Your Honor. |
| THE COURT: | Right. |

(Tr. (2/1/12) at 24:8-25:8); (see also Compl., ¶ 28(a); page 30, *infra*).

- The Court asked Mr. Cohen how many collection phone calls were placed by ACB to Plaintiff where there were individuals on both ends of the phone line. In other words, did Plaintiff or Mr. Cohen speak to a representative of ACB during the debt collection effort. Mr. Cohen stated that there were "at least two" and that he "believed there were

21

two." (Tr. (2/1/12) at 7:3-16.)   When Mr. Cohen was questioned whether Plaintiff herself ever spoke with ACB representatives, Mr. Cohen stated very clearly that there were two phone calls—on one, Mr. Cohen spoke with an ACB representative; on the other, Mr. Cohen stated that Plaintiff spoke with an ACB representative. (Tr. (2/1/12) at 7:17-19.)   These calls were apparently so traumatic that Plaintiff was "really shook up . . and could not sleep at night." (Cohen Decl., ¶ 17). Mrs. Cohen also supposedly was so fearful "that the debt collector might come and get her," that she "was initially hesitant to file the action." (Cohen Decl., ¶ 18.) *Yet*, as it turns out, according to Defendant's records (and unresponded to by Mr. Cohen), Plaintiff herself <u>*never*</u> spoke with any of Defendant's representatives.  Rather, the *only* live contact with any of Defendant's agents was a single *inbound* phone call placed *by Mr. Cohen to Defendant.*[17]   Thus, contrary to Mr. Cohen's representations, it appears that Plaintiff herself never spoke with an ACB representative, and the only live phone communication between the Cohens and ACB was when <u>Mr.</u> Cohen reached out and placed an inbound phone call to ACB.[18]

- Mr. Cohen declares that he made his "initial contact with ACB on August 5, 2010, notifying them that I represented the Plaintiff . . . ." (Cohen Decl., ¶ 24.)   However, this also appears to be inconsistent, because Plaintiff also pleaded in the Complaint that the debt was improperly discussed with <u>him</u> as a third-party on June 30, 2010. (Compl., ¶ 20.)   Defendant states that the only contact with Mr. Cohen during the debt collection was an *<u>inbound</u>* phone call placed on July 5, 2010.  (Def.'s Supp. Ltr. ¶¶ 7, 16.)

- Mr. Cohen has taken different positions on why he filed this case.  Mr. Cohen at one point claimed that he "undertook to litigate this case

---

[17]   To support Plaintiff's supposed fears, Mr. Cohen cites to the "Declaration" of his wife, Plaintiff Miriam Cohen.  (Pl.'s Br. 3.)   However, no declaration from Miriam Cohen was ever submitted.

[18] Had this case progressed, it is quite possible that Mr. Cohen may have become a conflicted lawyer/witness—particularly because he included his conversation with ACB in the allegations of the Complaint.  (Compl., ¶ 20.)

because the Plaintiff reported to me that she was scared of the Defendant
. . . ." (Cohen Decl., ¶ 16.)  Yet, in emails with ACB, Mr. Cohen
revealed that "[t]he fact is, *the reason I filed this case is* the same as why
I filed *Foti*, *to make law in this district*."  (Def.'s Opp'n Ex. 3)
(emphases added).

The Court could go on.  However, the point is that the allegations were
needlessly murky.

### 3.   The Litigation was Unreasonably Prolonged By Plaintiff's Assertion of A Baseless Legal Theory

Having case managed this case from its inception, the Undersigned believes
that Plaintiff's counsel unreasonably pursued meritless legal theories, performed
irrelevant legal research, and demanded monetary settlements well beyond the
maximum amount that Plaintiff could recover if she won the case.

All of the allegedly violative debt collecting activity in this case, "at least 15"
supposed violations, occurred prior to the filing of the Complaint.  Yet, Plaintiff filed
the present Complaint specifically referring to the 15 violations but seeking to
recover for only <u>one</u> of the violations—while demanding the value of at least <u>ten</u>
lawsuits to settle.  The Complaint states:

> 9.   Plaintiff believes that [Defendant] has committed at
> least fifteen FDCPA violations.

> 10.   This action is to recover statutory damages for just
> one of the multiple violations committed by
> [Defendant]

(Compl., ¶¶ 9-10.)

The Complaint was structured in this way so that Plaintiff could attempt to file, or at least use as settlement leverage, multiple subsequent lawsuits and bypass the clearly established law limiting to $1,000.00 the statutory maximum amount recoverable per action under the FDCPA. <u>See, e.g.</u>, <u>Goodman v. People's Bank</u>, 209 Fed. Appx. 111, 114 (3d Cir. 2006) (Fair Debt Act limits "statutory damages to $1,000 per successful court action."); <u>Wright v. Fin. Serv. of Norwalk, Inc.</u>, 22 F.3d 647, 650-51 (6th Cir. 1994) (en banc) ("Congress certainly knows how to write statutes that make each separate violation subject to a separate penalty, or even that make each separate day of a violation a separate offense subject to a separate penalty. There is no such intimation, however, anywhere in the actual language of 15 U.S.C. § 1692(k)(a)(2)(A), elsewhere in the act, or in any of the surrounding legislative history."); <u>Harper v. Better Bus. Servs., Inc.</u>, 961 F.2d 1561, 1563 (11th Cir. 1992) ("The FDCPA on its face does not authorize additional statutory damages of $1,000 per violation of the statute, of $1,000 per improper communication, or of $1,000 per alleged debt. If Congress had intended such limitations, it could have used that terminology.").

Plaintiff was required to join in her Complaint any and all pre-suit violations of the Act she contends were committed by Defendant in attempting to collect on the

single debt.  It would be contrary to well-settled law—as well as logic—to permit a plaintiff to identify numerous alleged violations, but bring them in successive federal lawsuits one at a time.

First, the statutory language of the FDCPA itself rejects Plaintiff's position, something Defendant made Mr. Cohen aware of prior to the filing of the Complaint. More specifically, Section 1692k(b)(1) of the Act specifically addresses the procedure when more than one violation has occurred in a single debt collection effort.  That Section provides that, in an action brought by an individual, the Court, in settling on an amount of statutory damages to award, should consider, among other things, "the frequency and persistence of noncompliance by the debt collector."  Id. The use of "frequency" and "persistence of noncompliance" in the language of the statute is clearly an expression that Congress envisioned that in lawsuits brought under the FDCPA, all offending acts would be brought in a single court action, and the volume of "noncompliance" -- in other words, the number of violations -- would be a factor is assessing damages.  Id.; Crossley v. Lieberman, 868 F.2d 566, 572 (3d Cir. 1989) (statutory damages are determined "by such factors as the frequency and persistence of noncompliance by the debt collector.").

Plaintiff is incorrect in her suggestion that a technical violation of the Act mandates an automatic award of $1,000.00.  Indeed, even when a Plaintiff is entirely

successful and prevails on a technical violation, statutory damage awards are routinely well below the statutory maximum.  <u>See, e.g.</u>, <u>Pipiles v. Credit Bureau of Lockport</u>, 886 F.2d 22, 28 (2d Cir. 1989) (declining to award any statutory damages when violation was technical and unintentional); <u>Weiss v. Zwicker & Assoc.</u>, 664 F. Supp. 2d 214, 218 (E.D.N.Y. 2009) (awarding $500.00 in statutory damages when violation was technical failure to provide amount of alleged debt).  Thus, it is the severity and persistence of the conduct that results in an increase of the statutory award to the $1,000.00 maximum.  <u>See, e.g.</u>, <u>Crossley</u>, 868 F.2d at 572-73; <u>Clomon v. Jackson</u>, 988 F.2d 1314, 1322-23 (2d Cir. 1993).

Plaintiff argues that reading the statute to limit statutory damages to $1,000.00 no matter the number of violations "incentivizes unscrupulous debt collectors."  That may be true in some cases, but certainly not in this case over a technical violation on a phone message.  More importantly, that is how Congress decided to account for a debt collector's multiple violations in collecting a single debt.  Plaintiff may be displeased with the amount of damages Congress determined was appropriate, but the Court is bound by the statute.  It does not authorize Plaintiff to attempt to structure her Complaint to increase the amount of damages available.

Second, withholding already accrued violations and bringing separate lawsuits *seriatim* would also violate the entire controversy doctrine.  In fact, it would abrogate

26

the doctrine entirely.  The entire controversy doctrine is a preclusionary principle intended to avoid the fractionalization of litigation by requiring joinder in a single action of all claims between the same parties arising out the same circumstances.  See, e.g., Rycoline Prod., Inc. v. C&W Unlimited, 109 F.3d 883, 887 (3d Cir. 1997).[19]  The purposes of the doctrine are threefold: (1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation.  See, e.g, Fields v. Thompson Printing Co., 363 F.3d 259, 265 (3d Cir. 2004).  The doctrine applies "to prevent a party from voluntarily electing to hold back a related component of the controversy in the first proceeding by precluding it from being raised in a subsequent proceeding thereafter."  Oltremare v. ESR Custom Rugs, 330 N.J. Super. 310, 314 (App. Div. 2000).

The entire controversy doctrine applies with full force to FDCPA claims.  In Beeders v. Gulf Coast Collection Bureau, 632 F. Supp. 2d 1125 (M.D. Fla. 2009), the consumer filed separate actions for each telephone call he alleged violated the FDCPA.  Id. at 1128-29.  The intent in doing so was to skirt the $1,000 statutory

---

[19] New Jersey's Entire Controversy Doctrine is part of the substantive law of New Jersey and applies equally in federal and state courts.  See Rycoline, 109 F.3d at 887 ("A federal court hearing a federal cause of action is bound by New Jersey's Entire Controversy Doctrine, an aspect of substantive law of New Jersey, by virtue of the Full Faith and Credit Act.").

maximum.  Id.  The Court held that Plaintiff was required to bring all of his claims in a single action and obtain a single statutory award of $1,000,00:

> These facts form a nucleus of operative facts that is identical in each suit.  The litigation of any one of these claims would have claim preclusive effect on the other cases.  These claims, which seek the same remedy and share the same nucleus of operative facts, are part of the same cause of action and, therefore, should be joined in the same suit as separate claims within the same cause of action.

Id.; see also Sclafani v. BC Servs., Inc., 2011 WL 43619, at *3 n.1 (S.D. Fla. Jan. 6, 2011) ("The Court further notes that Plaintiff is precluded from asserting a separate cause of action regarding the 'similar or identical' messages that he alleges Defendant left on his answering machine, because these 'similar or identical' messages should have been raised in detail as part of the allegations of this case.").[20]

Plaintiff's attempt to withhold multiple "claims" and save them for some later date was a litigation tactic that multiplied the proceedings and impeded resolution of

---

[20] Despite large amounts of time billed to legal research, the only case Plaintiff offers in support of his multiple proceeding approach, Goins v. JBC & Assoc. P.C., 352 F. Supp. 2d 262 (D. Conn. 2005), is distinguishable.  That case involved an alleged violation of the Fair Debt Act that _occurred after the initial suit_ for alleged FDCPA violations was filed.  Id. at 266.  The court specifically held that separate suits for separate violations of the FDCPA may be brought only when "the subsequent action is not duplicative and would not be barred under the claim preclusion doctrine." Id. In other words, Goins stands for the principle that, if there is pending lawsuit and another violation occurs after that complaint was filed, perhaps a second case would be permitted.  That is not what happened here.

the case.  Plaintiff was offered more than she could ever hope to recover under the FDCPA—$1,500.00—before this case was ever filed.

### 4.   **Plaintiff Was Only Marginally "Successful"**

The Complaint seeks to recover for "actual damages" in an amount to be determined at trial.  (Compl., ¶ 28.)  However, Mr. Cohen admits that Plaintiff did not pursue the actual damages claim:

> THE COURT:   [B]ut clearly you didn't pursue and you accepted the offer of judgment.  You didn't pursue the actual damages claim.
>
> MR. COHEN:   Exactly.

(Tr. (2/1/12) at 20:21-24.)  Thus, Plaintiff clearly was not "successful" in litigating the actual damages claim pleaded in the Complaint.

It is also unclear how successful Plaintiff was with the other aspects of her Complaint.   While she received the maximum statutory award available, that apparently was not the real intent of filing the case.  In Mr. Cohen's own words, the "reason *I* filed this case . . . is to make law in this District."  (Def.'s Ex. 3) (emphasis added).   An effort to make new law is fine.  But, it didn't happen.

The Supreme Court has noted that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained."  <u>Farrar</u>, 506 U.S. at

29

114.   Here, Plaintiff's desire to create new law was unsuccessful and ultimately

abandoned; yet, it is responsible for nearly all attorney's fees sought in this case.  It

could reasonably be said that Plaintiff failed entirely and should be awarded no fee

at all.  See, e.g., Farrar, 506 U.S. at 114 (noting that, where success is limited, "the

court may award low fees *or no fees*, without reciting the 12 factors bearing on

reasonableness.").

### 5.   Plaintiff and Her Counsel Do Not Have an Arms-Length Relationship

Mr. Cohen is Plaintiff's husband.  They live at the same address in New Jersey,

which is also Mr. Cohen's law office.

In determining a reasonable fee award, the Court may consider the nature of the

attorney-client relationship and the fee arrangement.  Windall, 51 F.3d at 1185 n.8.

Accordingly, the Court requested that Plaintiff's counsel submit any retainer

agreement in this case.  The agreement contains the following provision relating to

legal fees:

> **4.    Legal Fees.**   The agreed hourly fee is $425.00.  ***You will be required to pay our fees regardless of the outcome of this case***.  The Firm may require you to pay your bill in full at any time it desires or opt to settle up your account at the completion of the case.  Unless you write to us challenging any specific billing entry within seven days of the receipt of your bill, you ratify the legitimacy of said bill.  By signing this agreement you ratify all past bills sent to you in this, or any previous, litigation.  The Law Firm has not

30

made any guarantees regarding the expected outcome of this litigation.

(Retainer Agreement dated June 10, 2010; CM/ECF No. 27-1.)

According to the above provision, Plaintiff presently owes her husband nearly $29,000.00, billed by him to secure a $1,000.00 statutory damage amount that was offered to her before the case was filed. Implausible, especially in view of Mr. Cohen's statements that he did the case to make new law.

Mr. Cohen's fee petition did nothing to establish an arms-length fee arrangement. Mr. Cohen prosecuted this case for his wife. It is unlikely that Plaintiff was provided with monthly billing statements, or that if she was, she would object to any of the numerous improper billing entries. This is because this is a fee shifting case, because Plaintiff and her husband are not engaged in paying attorney-client relationship, and because Plaintiff was likely never going to pay her husband for any of the time spent on the file. In other words, there was no detached client to act as a check on the amount of attorney billing.

The truth is that Plaintiff's counsel has constructed a careful arrangement to attempt to secure an award of attorney's fees. If Plaintiff had retained counsel other than her husband, Plaintiff would recover the amount of the Offer of Judgment, and that counsel would be awarded an attorney's fee. If Plaintiff herself had brought the

claim, she would not be entitled to any attorney's fee at all.[21]  But in the manner in which this case has been set up, Plaintiff has her husband bring the claim, and he then may recover an attorney's fee for himself, which then will benefit the Plaintiff as well.

In the context of fee shifting statutes, importance has been placed on the ability of counsel to provide detached, "independent, dispassionate legal advice . . . ." Ford v. Long Beach Unified School Dist., 461 F.3d 1087, 1091 (9th Cir. 2006).  And generally, such statutes "assume a paying attorney-client relationship, [and] are intended to assist litigants who could not otherwise afford to retain independent counsel," Kooi v. Sec. of the Dep't of Health and Human Servs., 2007 WL 5161800 (Ct. Fed. Cl. Nov. 21, 2007).  Thus, in a situation like this, where a husband is assisting his wife (and himself), the incentive for awarding an attorney's fee is diminished:

> Although the undersigned is not aware of any prohibition against an attorney-spouse acting on behalf of a spouse, the relationship to be categorized as an attorney-client relationship for purposes of incurred costs must be evidenced by a formal, established relationship. . . . [W]ithout some evidence of a business relationship it cannot be said that petitioner incurred a cost for her husband's work.  In this case, there is no evidence that

---

[21] See, e.g., Kay v. Ehrler, 499 U.S. 432 (1991).

> [petitioner] entered into a *paying*, attorney-client
> relationship with her husband. . . [the] assistance to the
> spouse was of the personal nature and did not stem from an
> attorney-client relationship, and is thus properly
> characterized as self-help.

Kooi, 2007 WL 5161800, at *3 (emphasis added) (citations omitted).

The nature of the attorney-client relationship in this case raises questions as to the amount of attorney's fee sought.

## 6.   **Summary**

This case was never about the merits.  Plaintiff was offered the maximum amount she could hope to recover for her FDCPA claims prior to the filing of the Complaint.  Even before this case was filed, the dispute disintegrated into a battle over a patently frivolous legal theory and the amount of attorney's fees that would ultimately be paid.  This contravenes the intent of the FDCPA.  See, e.g., Lee, 109 F.3d at 306-07.

Attorneys may posture over fees, but that does not mean the Court should tacitly approve such conduct by awarding a substantial fee.  The Undersigned had "a ringside view" of this litigation.  And that view confirms that the only reasonable attorney's fee should be the amount that was accrued at the time the pre-suit settlement offer was made.  That offer provided full value for Plaintiff's legitimate

claim.  Thus, the Court will compensate Plaintiff's counsel for the 2.65 hours billed[22] prior to receipt of the initial settlement offer at $395.00 per hour.  The total attorney's fee is $1,046.75.[23]

## 7.    <u>The Lodestar Calculation Confirms the Propriety of the Award</u>[24]

The lodestar method directs calculation of a fee award based on the multiplication of the hours reasonably expended by a reasonable hourly rate.  This Court has already explained why no hours expended beyond rejection of the pre-suit settlement offer of the maximum damages were "reasonably" expended.  To repeat, the time billed beyond the pre-suit settlement offer were spent in furtherance of a flawed legal theory that was eventually abandoned.  Likewise, the wholesale abandonment of the theory correspondingly impacted the success Plaintiff achieved in this case.

Plaintiff's counsel will be credited with 2.65 hours of legal work all performed on or before the date of the pre-suit settlement offer.  Plaintiff's hourly rate of $395.00 is also accepted as reasonable.  As a result, multiplying the hours performed

---

[22]  This refers to time entries on 6/10/10 (0.5 hrs.); 6/30/10 (0.4 hrs.); 8/5/10 (0.75 hrs.); 8/20/10 (0.50 hrs.); and 8/25/10 (0.5 hrs.).  Total 2.65 hours.

[23]  2.65 x $395.00=$1,046.75.

[24]  The Court primarily reaches its fee determination as a matter of general reasonableness wholly apart from the lodestar.  However, application of the lodestar would reach the same result.

by the reasonable rate results in **$1,046.75** in attorney's fees.[25]  Costs will also be awarded in the amount of $**453.00** for filing and serving the Complaint and traveling to a Court-ordered conference.  The total award is **$1,499.75**.

**CONCLUSION**

For the reasons stated above, it is respectfully recommended that Plaintiff's motion for attorney's fees and costs be **GRANTED IN PART AND DENIED IN PART**.  It is recommended that Plaintiff be awarded **$1,046.75** in attorney's fees and **$453.00** in costs for a total award of **$1,499.75**.

　　　　　　　　　　　　　　/s/   Mark Falk
　　　　　　　　　　　　　　**MARK FALK**
　　　　　　　　　　　　　　**United States Magistrate Judge**

**DATED:   March 13, 2012**

---

[25] No line by line analysis of the billing statements is necessary.  Cf. Thompson v. Wolpoff & Abramson, 312 Fed. Appx. 161, 164 (11th Cir. 2008) (citing Hensley, 461 U.S. at 436-37).  However, in the event a line by line analysis were called for, the Court observes that the billing statements contain a number of entries that are facially improper, excessive, and/or unnecessary.  For example, Plaintiff's counsel billed 1.5 hours to perform research on his "multiple lawsuit theory" (time entry dated 9/15/10); 9.45 hours associated with discovery, including unsigned discovery responses (time entries dated 2/24/11; 3/1/11; 3/10/11; 3/15/11; 3/19/11; and 3/21/11); 2.2 hours for legal research relating to amended pleadings and preparation of an amended complaint; however, no amended pleading was ever filed (time entry dated 3/7/11); and 8.1 hours to attend a Court-ordered settlement conference that was supposed to begin at 10:00 a.m. but was delayed until 2:00 p.m. because Plaintiff failed to appear (time entry dated 2/14/11).  This is but a small sample of time that was excessively or improperly billed in this case.