IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MIRIAM COHEN**, <br><br> Plaintiff, <br><br> vs. <br><br> **AMERICAN CREDIT BUREAU, INC.**, <br><br> Defendant. | Case No. 2:10-CV-05112 |

**PLAINTIFF MIRIAM COHEN'S LOCAL CIVIL RULE 72.1(c)(2) BRIEF
OBJECTING AND RESPONDING TO THE REPORT AND
RECOMMENDATION OF THE HONORABLE MAGISTRATE FALK
ON PLAINTIFF'S MOTION FOR FEES AND COSTS**

**INTRODUCTION**

Magistrate Falk's Report & Recommendation of March 13, 2012 (the "Magistrate Report") lays the foundation for its findings stating "The FDCPA was not passed in order to sprout a cottage industry for lawyers." Magistrate Report p. 4. Not only is this statement antithetical to the expressed intent of congress in adopting the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692(a), but also flies in the face of well standing law. Hensley v. Eckerhart, 461 US 424, 456 (1983)(holding that statutory "fee awards [were] intended to provide an incentive to competent lawyers to undertake" the type of work for which the statute authorized attorneys' fees); Graziano v. Harrison, 950 F.2d 107, 113 (3d Cir. 1991) (FDCPA "attorney's fees should not be construed as a special or discretionary remedy; rather, the Act mandates an award of attorney's fees as a means of fulfilling Congress's intent that the Act should be enforced

1

by debtors acting as private attorneys general"); Weiss v. Regal Collections, 385 F. 3d 337, 345 (3d Cir. 2004). Similarly, when Congress has empowered plaintiffs to act in this private attorney general role, their specific intent was to incentivize attorneys to take such cases. City of Riverside v. Rivera, 477 U.S. 561, 580-81 (1986)(discussing the role of the private attorney general, the Supreme Court held that "It is clear from the legislative history that § 1988 was enacted because existing fee arrangements were thought not to provide an adequate incentive to lawyers particularly to represent plaintiffs"). As such, it is clear that congress specifically intended to create an industry for FDCPA litigation.

Moreover, the Magistrate Report comments on the fact that FDCPA cases are usually straight forward and chastises the fact that the dispute often comes down to attorney's fees. Nevertheless, the Court of Appeals in this Circuit has acknowledged this fact and has stated that this is specifically the design of the FDCPA. Graziano, 950 F.2d 107, 113 (3d Cir. 1991); Sanders v. Jackson, 209 F.3d 998 (7th Cir. 2000) ("FDCPA suits usually entail significant awards of attorneys' fees, above and beyond any damages awarded. Although the attorneys' fees provision of the Act may or may not have been designed to be punitive *per se*, we have noted that attorneys' fees are punitive in the broad sense of the term in that they deprive the defendant of capital and thereby provide a strong incentive not to violate the law in the future.")

The report also goes so far as to paint the victim as the "victimizer" by actually blaming the Plaintiff, the victim of FDCPA violations, for the repeated violations of the Defendant rationalizing that Plaintiff didn't send a cease and desist letter until after the Defendant already committed several FDCPA violations and that "Plaintiff could have

cut off all further debt collection efforts by Defendant much earlier." Magistrate Report, p. 7. As far as Plaintiff is aware, no other Court in this country has rationalized a collection agency's abuses of the FDCPA in such manner.

On February 1, 2012, Magistrate Falk convened a telephone conference which amounted to a mini hearing regarding several issues on which the Court sought clarification. The Court gave no prior notice of such mini hearing and neither party had the opportunity to properly prepare for the many and intense questions from Magistrate Falk.[1] The Magistrate Report criticized Plaintiff's attorney for certain inconsistencies which were immediately clarified by Plaintiff's attorney in Plaintiff's supplemental brief submitted to Magistrate Falk right after the telephone conference.

## **THE ISSUES**

The Magistrate's Report raises three critical issues in justifying its exercise of discretion to deny most of the attorneys' fees requested. Specifically, it (i) blames the length of the litigation on the Plaintiff, (ii) characterizes Plaintiff's prosecution of this case as "bad faith," and (iii) questions the extent of the success achieved by the Plaintiff.

---

[1] As the Court did not explain the purpose of the conference, Plaintiff assumed the purpose was to schedule oral arguments on the fee petition. At the time of the phone conference, Plaintiff's attorney was out of the office.

## THE LENGTH OF THE LITIGATION

**THE SIMPLE FACT IS THAT PLAINTIFF MADE REPEATED OFFERS FROM THE BEGINNING TO SETTLE THIS CASE FOR STATUTORY DAMAGES PLUS REASONABLE ATTORNEYS FEES BUT DEFENDANT REFUSED TO ACCEPT PLAINTIFF'S OFFERS UNTIL AFTER DISCOVERY, AND NEVER EXPLAINED WHY IT DELAYED THE LITIGATION**

Plaintiff's moving papers demonstrated how this litigation was prolonged exclusively by the fact that Mr. Perr, Esq., Defendant's attorney, intentionally waited until the end of written discovery before tendering Defendant's Rule 68 Offer of Judgment and then played the "victim" claiming that all the time spent on litigation was unnecessary.  Plaintiff Miriam Cohen's Brief in Support of Motion for Fees and Costs (Plaintiff's Fee Brief") p. 4-5.  Plaintiff placed before this court repeated correspondence it had with Mr. Perr in which Plaintiff's attorney pushed Defendant to settle this case early on, but Defendant insisted on defending this case.  In fact, as asserted in Plaintiff's pleadings, defendant explicitly stated at the very first Court conference that it was its full intention <u>not</u> to settle but to vigorously defend this action.  Plaintiff's Reply Brief in Support of Motion for Fees and Costs, p. 2.

On January 22, 2011, at the very beginning of the case and before any Court conferences, I wrote to Mr. Perr stating "My offer to settle this case would be the statutory damages plus my legal fees so far."  <u>See</u>, Plaintiff's Supplemental Letter Brief dated February 2, 2012, (the "Supplemental Brief") at Exhibit C.  This offer was not accepted by Defendant.

On February 1, 2011, I again wrote to Mr. Perr stating "I would settle just the claims alleged in this action for the $4,500 you propose, but not all of my client's potential claims." This offer was not accepted by Defendant.

On February 14, 2011, at the settlement conference with the Court, Plaintiff offered to settle the case, however, Defendant didn't even counter with a counter-offer but instead insisted on its intention to defend the merits of this action.

The fact is that though Plaintiff has documented her reasonableness and willingness to settle this case from the beginning, Mr. Perr has never adequately explained why he prolonged this case and waited to tender Defendant's Rule 68 Offer until after the completion of written discovery. Though the issue was repeatedly raised, Mr. Perr has avoided the question in his pleadings.

Notwithstanding, the Magistrate Report in assessing who was to blame for the cause of the prolonged litigation states:

> Had Defendant filed its Offer of Judgment at the outset of the case, it could have forced the issue and might have limited the legal fees requested. <u>Defendant has not fully explained its delay in filing the Offer of Judgment</u>. Settlement offers are not offers of judgment pursuant to Federal Rule of Civil Procedure 68. Thus, <u>Defendant exposed itself to increased fees and costs by not offering judgment</u>.

Magistrate Report, p. 4. (Emphasis added).

The first problem is that Defendant absolutely had given an excuse to the Court why it waited until the end of Discovery to tender its Rule 68 Offer. Plaintiff, in the Supplemental Brief, pointed out to Magistrate Falk the falsity of such explanation. Specifically, what the Magistrate Report leaves out is that Mr. Perr represented to the Court during the February 1, 2012, conference call that the reason he waited so long to

5

file Defendant's Rule 68 Offer was that he was deliberately waiting for the statute of limitations to run out on Plaintiff's other claims.  In the Supplemental Brief, Plaintiff pointed out that Mr. Perr's contention is completely contradicted by the fact that the Mr. Perr ultimately tendered Defendant's Rule 68 Offer on March 25, 2011, less than eight months from the Defendant's last call to Plaintiff and only nine months and nine days after their first call to Plaintiff, well within the statute of limitations.  The Magistrate Report ignored Mr. Perr's misrepresentation of why the Defendant prolonged the litigation even though it is clear that the excuse he gave to the Court was false.[2]  It is respectfully submitted that this specific issue is critical to the fee petition as the blame for prolonging the litigation turns on Defendant's purposeful decision[3] to wait until after written discovery was completed before finally agreeing to settle this case for statutory fees plus attorneys' fees as Plaintiff demanded at the beginning of the case.  It is for this reason that Plaintiff believes that the full amount of attorneys' fees should be awarded.

The second problem is that the Magistrate Report states that had Mr. Perr filed the Rule 68 Offer at the beginning, Defendant "might have limited the legal fees."  The fact is that had Defendant filed its Rule 68 Offer upon being served with the Complaint, they absolutely <u>would</u> have limited at least 95% of the legal fees.

---

[2]      Plaintiff also pointed out to the Court that Mr. Perr, in attempting to lower Plaintiff's attorney's hourly rate, misrepresented to the Court that Plaintiff's attorney had less than ten years of experience even though he knew from the fee petition that such was untrue.  The significance of having less than ten years was material since Mr. Perr attempted to fit Plaintiff's attorney's hourly rate into the 6-10 year tier of the fee schedule prepared for Community Legal Services of Philadelphia, Pennsylvania an out of state organization.  See, Plaintiff's Reply Brief In Support of Motion for Fees and Costs, p. 13-14.  The Magistrate Report looked the other way on this as well.

[3]      Plaintiff's supplemental brief memorialized the fact that Mr. Perr was asked by Magistrate Falk during the February 1, 2012, conference call with the Court why he waited so long before tendering the Rule 68 Offer and why such delay should not make his client liable for the attorneys' fees incurred as a result and that Mr. Perr responded that the decision to wait was a deliberate and calculated one.

Nowhere in Defendant's opposition to the fee petition does it address this question regarding its decision to strategically prolong the litigation.  Instead, Defendant rationalizes its request that Plaintiff not be awarded attorneys' fees by characterizing Plaintiff's FDCPA case as "standard," "basic," and "simple, straightforward," but cannot explain why if it was so "simple and straightforward" did he not just end it on day one with a Rule 68 Offer which Mr. Perr explicitly concedes Plaintiff would have accepted.[4]

Finally, the Magistate Report, p. 4, acknowledges that "Defendant exposed itself to increased fees and costs by not offering judgment [at the beginning of the case]," yet, instead of placing the blame where it rightfully belongs, especially since Mr. Perr conceded that it was his client's conscious decision to wait until late in the case to finally settle this case on the terms Plaintiff had been proposing since the beginning of the case, the Magistrate Report decided to overlook the fact that Mr. Perr misrepresented to this Court why it waited until the end of written discovery to tender its Rule 68 Offer, ignored all the offers Plaintiff made to settle this case from the beginning, and instead turned the fault on Plaintiff.

---

[4]  Mr. Perr writes that "Plaintiff's acceptance of the Offer of Judgment is irrefutable evidence of Plaintiff's willingness to accept a reasonable settlement offer" and such establishes that had Mr. Perr done so on the day ACB was served, this case would have been settled and done with.  ACB's Opposition Brief, P. 8.

## **THE ALLEGATION OF BAD FAITH**

**NO CASELAW IS CITED BY THE DEFENDANT OR THE MAGISTRATE REPORT THAT HOLDS THAT PLAINTIFF WAS REQUIRED TO SETTLE ALL HER CLAIMS, EVEN THOSE OUTSIDE THE FOUR CORNERS OF HER COMPLAINT**

Though the Magistrate Report attempts to minimize the extent of the violations committed by the Defendant and suggests that all the violations stemmed from a single act,[5] the documentation provided by Plaintiff contradicts such. There were at least thirty different events, many of which contained multiple FDCPA violations. In fact the chart of violations submitted with the Supplemental Brief detailed almost forty FDCPA violations Plaintiff alleges were committed by the Defendant. These violations were not simply technical gaffs, they included phone calls to Plaintiff's place of work, conversations with Plaintiff's co-workers, failure to make required disclosures in nearly all communications, threats to take action the Defendant did not intend on taking and the Defendant misrepresenting himself as an attorney when in fact he was not. Plaintiff, in addition to her FDCPA claims against the defendant, also had separate claims for fraud,[6] for which the state of limitation has not expired. The various claims that Plaintiff

---

[5]   The Magistrate Report, p. 6, uses the analogy that "if a debt collector sent one letter that contained ten technical violations of the FDCPA, the victim could theoretically bring 10 separate federal cases to remedy the violation." This analogy ignores the fact that there were over thirty separate and distinct incidences involving the Defendant and the Plaintiff. This fact was plead in the pleadings and was also supplied to the Court in a chart which was part of the Supplemental Brief.

[6]   Defendant, in one of the recorded messages he left on the plaintiff's answering machine, a copy of which was produced, stated that he was calling from Defendant's "litigation unit". Defendant clearly gave the "impression that [he] is licensed to engage in the practice of law" under N.J.S.A. 2C:21-22(b)(1) "A person is guilty of a crime of the fourth degree if the person knowingly engages in the unauthorized practice of law and: (1) Creates or reinforces a false impression that the person is licensed to engage in the practice of law. Such unlicensed practice of law, was a completely separate act from the allegations of this Complaint and gives rise to various separate causes of action, including one pursuant to N.J.S.A. 2C:21-22(b)(1) in New Jersey state court.

8

had against the Defendant stemmed from distinctly different occurrences and each had different standards of proof.

Plaintiff was never required to forfeit all her claims in exchange for a settlement of just this one.  In fact, no case is cited to support this position.

**THE MAGISTRATE REPORT CLAIMS THAT PLAINTIFF NEVER PROVIDED SUPPORT FOR THE FACT THAT ITS POSITION REGARDING MULTIPLE FDCPA ACTIONS WAS REASONABLE**

With respect to the issue of multiple FDCPA actions, the Magistrate Report states "Plaintiff maintained the position . . . . [and] no authority for this position was provided [by Mr. Cohen]."  This is simply untrue.

Plaintiff's Reply Brief in Support of Motion for Fees and Costs, p. 4-5, specifically addressed the issue and cited numerous cases that support the fact that it was at least reasonable to take this position.  However, it now seems that none of the cases submitted by the Plaintiff were taken into consideration by the Magistrate Report when it concluded that such position was "improper."  Moreover, e-mails to Mr. Perr were also provided to the Court that further demonstrated that Plaintiff had, in fact, provided support for this position.  See, Supplemental Brief at Exhibit E.

The caselaw provided to both this Court and the Defendant is as follows. Goins v. JBC & Assocs., P.C., 352 F. Supp. 2d 262, 267 (D. Conn. 2005), though not binding but certainly persuasive, found that "There is no prohibition in the FDCPA against separate lawsuits for separate statutory violations of the FDCPA by the same defendant" and that the statutory cap was 'per action' and not on all claims a plaintiff may have against a single defendant.  Id. at 267;  Harper v. Better Business Servs.,

9

Inc., 961 F.2d 1561, 1563 (11th Cir.1992) (statutory language supports conclusion that statute authorizes a maximum of $1,000 additional damages per lawsuit); Barber v. National Revenue Corporation, 932 F.Supp. 1153 1996 WL 407578 (W.D.Wis. 1996)(case law and analysis of statutory language indicates that an individual's statutory damages are limited to $1,000 for each action); Teng v. Metropolitan Retail Recovery, Inc., 851 F.Supp. 61, 69 (E.D.N.Y. 1994); Donahue v. NFS, Inc., 781 F.Supp. 188, 191 (W.D.N.Y.1991); Beattie v. D.M. Collections, Inc., 764 F.Supp. 925, 928 (D.Del. 1991).

In Wright v. Fin. Serv. of Norwalk, Inc., 22 F.3d 647, 651 (6th Cir. 1994) Judge Jones in his dissent states, in relevant part:

> Both the legislative history and the articulated purpose of the FDCPA support the conclusion that the $1000 limit applies per violation. . . . The legislative history reveals a similarly broad desire to remedy debt collection abuse, which is a "widespread and serious national problem." S.Rep. No. 382, 95th Cong., 1st Sess. 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Reading the statutory language to apply a per violation limit of $1000 would best serve these broad goals. However, the majority's holding today will likely achieve an opposite result.
>
> Because Congress has designated consumers as the primary watchdogs over FDCPA violations, a per proceeding limit of $1000 unwisely frustrates the FDCPA's broadly stated goals.
>
> Moreover, the majority's holding in the instant case invites an even greater harm. The majority's refusal to apply the $1000 limit to each violation illogically rewards unscrupulous collectors who, having engaged in an initial violation during attempts to collect on a particular debt, continue with their abusive practices. Applying a flat $1000 ceiling to any one proceeding, regardless of the number of violations involved, means that as the number of violations increases, the cost per violation to the collector decreases.

Wright, 22 F.3d at 652-53.

All of the above caselaw was presented to Magistrate Falk.

10

Taking a step away from the merits of the arguments, this was never a right vs. wrong issue, but rather a question of whether taking such position constitutes "bad faith."  Especially since the matter has not been decided in this Circuit, there has been no unanimous or overwhelming decision on this matter, and that other judges, including Judge Jones of the 6th Circuit Court of Appeals, have taken this position, Plaintiff's view on this cannot be characterized as constituting "bad faith," no more than can the same position taken by litigants and other Judges be considered "bad faith."

Finally, a finding of "bad faith" is contradicted by Mr. Perr's own concession that "Plaintiff's acceptance of the Offer of Judgment is irrefutable evidence of Plaintiff's willingness to accept a reasonable settlement offer."  ACB's Opposition Brief, P. 8. Such definitively establishes that had Mr. Perr tendered a Rule 68 Offer on the day Defendant was served, this case would have been settled and done with.

**THE AWARD OF ATTORNEYS' FEES IN THIS CIRCUIT FOR AN FDCPA ACTION IS NOT DISCRETIONARY, BUT MANDATORY**

> The conclusion that an award of attorney's fees is mandated is further supported by section 1692k(b). That section specifies that, in determining the amount of statutory damages to be awarded, the court must consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." . . .
>
> However, section 1692k contains no parallel language directing the court to consider particular factors in determining a reasonable attorney's fee. In light of the explicit listing of factors to be considered in the award of statutory damages, and the absence of such a list for attorney's fees, we think it <u>inappropriate</u> to read such factors into the word "reasonable" in section 1692k(a)(3).

<u>Graziano</u>, 950 F.2d at 113-114 (Emphasis added).

## **THE SUCCESS ACHIEVED BY THE PLAINTIFF**

**THE MAGISTRATE REPORT MINIMIZES PLAINTIFF'S SUCCESS AND FOCUSES ITS ATTENTION ON THE FACT THAT PLAINTIFF DID NOT PURSUE HER CLAIM FOR ACTUAL DAMAGES**

Plaintiff now finds herself in an interesting catch 22 situation. Had she rejected the Rule 68 Offer and attempted to obtain a larger settlement based on her claim of "actual damages" this Court surely would have chastised her and further questioned the integrity of the Fair Debt bar. Magistrate Report, p. 2. On the other hand, having settled the matter for more statutory fees than she could have received at trial she is criticized as having been "only marginally successful". Magistrate Report, p. 29.

What the Magistrate Report overlooks is that Plaintiff's action accomplished a significant amount in furtherance of the rights of debtors. The Defendant ultimately fired the specific debt collector that committed all or most of the documented FDCPA violations. It is furthermore clear that Plaintiff's action forced the Defendant to take the FDCPA more seriously.

The Magistrate Report claims that Plaintiff had limited success because it did not prevail on her claim for actual damages. The Supreme Court has held that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley v. Eckerhart, 461 U.S. 424, 435 (1983). Moreover, in Texas Teachers Assn. v. Garland School Dist., 489 US 782, 789 (1989) the Supreme Court added that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." (Emphasis added).

In this case, the statutory damages under the FDCPA were clearly the "significant issue" in this case. Accordingly, though Plaintiff agreed to settle just the statutory damages in her claim, such does not minimize her status as a "prevailing party." Texas Teachers Assn., 489 US at 789. See, also Hensley, 461 U.S. at 431 ("It is also not legally relevant that plaintiff's counsel expended a certain limited amount of time pursuing certain issues of fact and law that ultimately did not become litigated issues in the case")(internal quotations and citations omitted).

Finally, to the extent that no considerable and distinct time was spent pursuing the actual damages component of Plaintiff's Complaint, such is moot. Even had there been a trial and Plaintiff would have lost on the actual damages issue, under Hensley, the attorneys' fees should not be reduced. Hensley, 461 U.S. at 435; Graziano, 950 F. 2d at 113 ("several courts have required an award of attorney's fees even where violations were so minimal that statutory damages were not warranted").

## **CONCLUSION**

The Magistrate Report seems to be largely directed to global policy issues unrelated to the merits of the fee petition and/or are simply a matter of personal and/or political perspective.[7] Specifically, the criticisms of the Magistrate Report center around issues outside the Complaint, such as the observation of the high number of FDCPA

---

[7] The recent rise in the number FDCPA cases filed, as pointed out in the Magistrate Report, is more likely the result of the increased volume of accounts receivables at businesses nationwide and a higher and more intense demand to lower those receivables by getting debtors to pay their bills – a phenomenon common during periods of bad economy. The more demand that exists to collect account receivables the more pressure there is on collection agencies to violate the FDCPA to accomplish such achievement. For that matter, the fact that the debt was originally $150 also lends two interpretations. Plaintiff contends that if a debt collector is willing to make over thirty contacts with an alleged debtor, call them at their workplace, speak with co-workers and misrepresent themselves as an attorney over a $150 debt, one can only imagine how they would collect a significantly larger debt.

13

cases filed during this bad economic era, other FDCPA cases that were litigated before Magistrate Falk, and/or deal with the merits of the underlying facts in this case.[8] In fact, so much of the Magistrate Report is commentary in nature and is a call for reform on FDCPA litigation.[9]

In fact, the weight of the Magistrate Report seems to be a balancing test of the perceived small results achieved by Plaintiff who will receive $1,001.00 against the approximately $30,000.00 in attorneys' fees request by Plaintiff.  Notwithstanding the great difference between the award to Plaintiff and the requested attorneys' fees it is still authorized by the FDCPA and is particularly appropriate in light of the punitive nature of the attorneys' fee award.

While the Magistrate Report criticized the fact that the Plaintiff was the attorney's wife, no concrete examples were given of how such factored into a reduction of the fee and such criticism amounts to no more than either speculation or a general comment on the attorney-client relationship in "a fee shifting case." Magistrate Report, p. 31.  The argument the Magistrate Report articulates is that had Plaintiff filed the claim herself, and not through an attorney, she "she would not be entitled to any attorney's fee at all".  Magistrate Report, p. 32.  The truth of this statement remains regardless of whether the Plaintiff is related to the attorney or not, and there is no authority supporting

---

[8]     The Magistrate Report, at p. 1, refers to letters Defendant claims to have sent to Plaintiff prior to the initial communication alleged by the Plaintiff.  Plaintiff never acknowledged receiving these mailings and maintains that she never received them.  Defendant never provided proof that such letters were actually mailed to the Plaintiff.  However, considering that this case was settled – notwithstanding the claimed existence of these letters – these mailings are completely irrelevant.

[9]     The Magistrate Report, citing Weed-Schertzer v. Nudelman, Klemm & Golub, 2011 WL 4436553 (D.N.J. Sept. 23, 2011), states "the integrity of the billing process in small Fair Debt cases is called into question. . . . the Undersigned believes it bears further observation" Magistrate Report, p. 2.  In Weed-Schertzer Magistrate Falk added "If faced with similar motions in the future, the Undersigned will further explore the billing practices employed and consider holding a formal hearing on the subject." Id. at *8.

the position that either (i) an FDCPA plaintiff must or should file her case *pro se*, as the Magistrate Report suggests,[10] or (ii) which prohibits a relative from representing an FDCPA plaintiff.  In this case, there was a proper attorney-client relationship, and at all points during the pendency of this case the client was informed and guided all necessary decisions.

Accordingly, Plaintiff requests that this Court modify the Magistrate Report and award Plaintiff the full amount of the attorney's fees and costs requested as follows:

    a.    Approving Plaintiff's attorney's hourly rate of $395, as did Magistrate Falk, since Plaintiff has adequately established the reasonableness of the rate and Defendant failed to adequately refute such;

    b.    Approving 80.75 hours of time spent to date at an hourly rate of $395 per hour, equaling $33,162.25 as reasonable attorney's fees for Michael M. Cohen; and.

    c.    $453.00 in costs.

Respectfully Submitted,

                                          **THE LAW OFFICES OF MICHAEL M. COHEN**

                                          By: _/s/ Michael M. Cohen_____
                                          Michael M. Cohen, Esq. (MC 2254)
                                          275 Walton Street
                                          Englewood, New Jersey 07631
                                          Telephone:  (201) 227-0881
                                          Facsimile:   (201) 227-0882
                                          e-mail: midtownlawyer@aol.com

                                          Attorney for plaintiff

March 27, 2012

---

[10] It is conceivable that such an issue may arise if the Plaintiff is a licensed attorney and chooses to be represented by her husband simply to garnish the benefit of attorneys' fees.  Such is not the case here as the plaintiff is a school teacher who is not an attorney.